972 F.2d 1339
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Nina GORIO; Julio Gorio, Plaintiffs-Appellants,
v.
Sherman BLOCK; Roy Brown; Daniel McCann; Ronald Zega, et
al., Defendants-Appellees.
 No. 87-6334.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted July 7, 1992.
Decided Aug. 5, 1992.
 
 Before FLETCHER, O'SCANNLAIN and KLEINFELD, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Nina and Julio Gorio appeal from the judgment entered in favor of defendants (including Los Angeles County, Sheriff Sherman Block, Deputy David Furmanski, Sergeant Willie Henderson and other officers) after a jury trial in their section 1983 suit. We affirm.
 
 FACTS
 
 3
 On October 26, 1984, members of the Los Angeles County Sheriff Departments' Special Weapons and Tactics ("SWAT") unit executed a search warrant at the home of Glenn Gorio in Agoura, California. The warrant had been issued by Magistrate John Merrick, based in part on information from confidential sources that Nina and Glenn Gorio were engaged in drug dealing. The warrant carried a nighttime service endorsement.
 
 
 4
 The police arrived at the Glenn Gorio home at 4:00 a.m. Gorio and his fiancee Sheri Lloyd were in the house. Officers testified that before entering the house they announced their identity and intentions; Lloyd testified she heard no warnings. The officers broke down the front door. Sergeants Henderson and Martin and Deputies Dickey, Tamayo, Diederich, Adams and Furmanski entered the home. Henderson was the supervisor of the entry.
 
 
 5
 Furmanski proceeded up the stairs, followed by Adams and Henderson. The officers heard Gorio's voice, asking, "Who's there?" Furmanski and other team members testified that they responded, "Sheriff's department." Furmanski, who was carrying an automatic MP-5 gun, with a flashlight attachment, saw Gorio pointing a gun at him. Gorio apparently fired. Furmanski fired at Gorio, killing him.
 
 
 6
 Nina and Julio Gorio, Glenn's parents ("appellants"), filed suit under 42 U.S.C. § 1983, claiming police illegally entered Glenn Gorio's home and used excessive force against him. The defendants included a number of the deputies who had participated in the raid, county sheriff Sherman Block and the county itself. A first trial ended in a mistrial. In the course of the retrial, the district court granted directed verdicts in favor of all officers except Henderson and Furmanski, and in favor of Sheriff Block and the county. The jury was asked on the verdict form several specific questions concerning the liability and qualified immunity of the remaining defendants, Furmanski and Henderson. While the jury was unable to agree as to whether there was an illegal entry or excessive force, it unanimously found that the officers enjoyed qualified immunity. The district court entered judgment in favor of the defendants. This appeal followed.
 
 JURISDICTION
 
 7
 The district court had jurisdiction under 28 U.S.C. 1331 and 1343. This court has jurisdiction under 28 U.S.C. 1291.
 
 DISCUSSION
 I. The Jury's Verdicts
 
 8
 Appellants contend that the district court erred in entering judgment for the defendants, because the jury returned inconsistent verdicts. They argue that the district court should have resubmitted the matter to the jury for clarification or attempted to reconcile the verdicts. Had the court chosen the latter course, they suggest, its efforts would have necessarily proven impossible, making a new trial necessary. We reject this argument because we find that the verdicts were not inconsistent.
 
 
 9
 The judge gave the jury a verdict form which enabled it to resolve the questions of the defendants' liability and qualified immunity through factual findings. The jury was asked four questions. Question one dealt with liability on the forcible entry issue; it asked if the defendants failed to give adequate warning before making forcible entry into the Gorio home. Question two dealt with qualified immunity on the same issue; it asked the jury to make findings on factual issues related to whether the police reasonably believed they were justified in not giving such a warning. Question three addressed liability on the excessive force issue. Question four addressed qualified immunity on this issue; it asked whether Furmanski reasonably believed his actions were necessary. The jury was not required to answer questions one or three before going on to questions two and four. The jury split evenly on questions one and three. It unanimously found in favor of the defendants on all subquestions asked as part of question two, and on question four.
 
 
 10
 The jury's verdicts were not inconsistent. It was not able to reach a conclusion as to whether the police violated Glenn Gorio's rights; however, it did conclude that, even if their actions were ultimately in error, the officers could reasonably have believed they were acting lawfully. Because the jury found the defendants had qualified immunity with regard to both alleged violations, the district court properly entered judgment in favor of the defendants.
 
 
 11
 II. Directed Verdicts in Favor of Sheriff Block and the County of Los Angeles.
 
 
 12
 Appellants argue the district court erred in entering directed verdicts in favor of Sheriff Block and the County of Los Angeles.
 
 
 13
 The district court's decision to enter a directed verdict is reviewed de novo. A directed verdict is proper where, when the evidence is viewed in the light most favorable to the nonmoving party and all possible inferences are drawn in favor of that party, "the evidence permits only one reasonable conclusion as to the verdict." Donoghue v. County of Orange, 848 F.2d 926, 932 (9th Cir.1987). For a party opposing a directed verdict to benefit from favorable inferences, it must present "substantial evidence" in support of its claims. Feldman v. Simkins Industries, Inc., 679 F.2d 1299, 1303 (9th Cir.1982).
 
 
 14
 A. Liability of Block in his individual capacity
 
 
 15
 A supervisor may be found liable for constitutional deprivations by a subordinate if the supervisor is personally involved in the deprivations or if there exists "a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." Hansen v. Black, 885 F.2d 642, 646 (9th Cir.1989). Liability may exist if the supervisor "implements a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation." Id. (citations omitted). Similarly, the supervisor may be liable if the deprivation resulted from a failure properly to train or supervise. Ybarra v. Reno Thunderbird Mobile Home Village, 723 F.2d 675, 681 (9th Cir.1984).
 
 
 16
 Appellants have failed to provide factual support for this claim. Block was not involved in or even aware of the operation in question. There was no evidence of a constitutionally defective policy or a policy of using excessive force; while the Sheriffs' Department procedures provided for the use of force if necessary, the use of excessive force was expressly prohibited. Nor was there evidence to support a finding that Block implemented or acquiesced in biased investigation procedures or failed properly to train or supervise his subordinates. Thus, a reasonable jury could not have found in favor of plaintiffs on the question of Block's liability in his individual capacity.[1]
 
 
 17
 B. Liability of Block in his official capacity and of the County of Los Angeles
 
 
 18
 Appellants also raised claims against Sheriff Block in his official capacity and the County of Los Angeles. They alleged that deputy Furmanski used excessive force against Glenn Gorio pursuant to a policy implemented and maintained by Block and the County.
 
 
 19
 In Monell v. New York City Dept. of Social Services, 436 U.S. 658 (1978), the Supreme Court held that a municipality may be found liable under section 1983 if the allegedly unconstitutional action of its employee "implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers." 436 U.S. at 690. A municipality or policymaker may also be held liable if plaintiff's injury results from a practice that, while it has not been officially endorsed, is so "permanent and well-settled" as to constitute government custom. Thompson v. City of Los Angeles, 885 F.2d 1439, 1444 (9th Cir.1989). However, "proof of random acts or isolated events are insufficient to establish custom." Id.
 
 
 20
 Here, appellants failed to submit evidence at trial of an ongoing practice of use of excessive force, either pursuant to an official policy or as a matter of custom. This was appellants' burden. The only evidence directly on point was that the Sheriff's office had a policy prohibiting the use of excessive force. Appellants contend that because department policy directed deputies to use force where necessary in the execution of lawful police duties, "there was evidence of a departmental policy or custom of resorting to the use of excessive force." As support for this argument, appellants rely primarily on Heller v. Bushey, 759 F.2d 1371 (9th Cir.1985), rev'd on other grounds sub nom. City of Los Angeles v. Heller, 475 U.S. 796 (1986). In that case, the plaintiff contended police had used excessive force, including attempted application of a choke hold. This court held that a directed verdict in favor of the City of Los Angeles was improper, because there was evidence that police officers acted pursuant to a department policy authorizing the use of "escalating force" and, specifically, the use of a choke hold to subdue uncooperative arrestees. The appellant was entitled to test the "reasonableness of that policy" at trial. 759 F.2d at 1374. However, the policy appellants cite here is quite different from that at issue in Heller: in Heller, the type of force the officers used was contemplated and approved by the department policy. This case more closely resembles Los Angeles Police Protective League v. Gates, 907 F.2d 879, 890 (9th Cir.1990), where this court found no evidence of an official policy of carrying out illegal searches, and, indeed, noted that policies to prevent such searches were in place.
 
 
 21
 Thus, the district court did not err granting directed verdicts in favor of defendants Block and County of Los Angeles.
 
 
 22
 III. Discovery and Trial Questioning with Regard to the Identity of the Confidential Informant
 
 
 23
 The defense disclosed to appellants various documents related to the magistrate's decision to issue the warrant. However, it redacted the documents to conceal the identities of the informants who had told police about Glenn and Nine Gorio's activities. The district court denied appellants' request for access to the redacted material. Appellants argue that the district court erred in denying discovery as to this information. They also contend that the court erred in refusing to allow cross examination or rebuttal or impeachment evidence relating to the information.
 
 
 24
 The district court's evidentiary rulings are reviewed for abuse of discretion and will not be reversed absent prejudice. Roberts v. College of the Desert, 870 F.2d 1411, 1418 (9th Cir.1988). Its denial of a motion to compel disclosure of a confidential informant's identity is also reviewed under this standard. United States v. Fixen, 780 F.2d 1434, 1439 (9th Cir.1986).
 
 A. Denial of discovery
 The "informer's privilege" is
 
 25
 the Government's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law. The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation.
 
 
 26
 Roviaro v. United States, 353 U.S. 53, 59 (1957); see also Fixen, 780 F.2d at 1439. The privilege applies in civil as well as criminal cases. Holman v. Cayce, 873 F.2d 944, 946 (6th Cir.1989); Dole v. Local 1942, IBEW, 870 F.2d 368, 372 (7th Cir.1989).
 
 
 27
 In the criminal context, a court determining whether the government can rely on the privilege must consider "the crime charged, the possible defenses, the possible significance of the informer's testimony and other relevant factors." Roviaro, 353 U.S. at 62. In the civil context, "the emphasis shifts ... to whether disclosure is essential to the fair determination of a party's cause." Holman, 873 F.2d at 946. The privilege belongs to the government "as of right", but will yield "when the identification of the informant or of a communication is essential to a balanced measure of the issues and the fair administration of justice." Dole, 870 F.2d at 372.
 
 
 28
 Here, the district court did not abuse its discretion in allowing the government to refuse to disclose certain information related to the probable cause determination, including the identity of the confidential informants. The district court concluded that the redactions to conceal the identities were no greater than necessary, and that the government's interest in protecting the safety of the informants outweighed appellants' interest in disclosure.
 
 
 29
 Appellants are unable to show that knowledge of the informants' identities would have helped the appellants' case to a degree that outweighed the potential danger to the informants. Appellants contend they wanted to challenge the informants in order to challenge the reasonableness of the officers' beliefs that they were dealing with a potentially dangerous individual. However, there was additional evidence that supported these beliefs: there was an ongoing investigation of Glenn Gorio's alleged drug trafficking activities, the police had information about Gorio's arms cache, and Gorio had previous arrests. Appellants obtained substantial discovery as to the officers' files on Gorio. Moreover, appellants fail to acknowledge that, to prove that the officers acted unreasonably, they would have to show not only that the magistrate improperly issued the warrant because the informants were unreliable, but also that the officers executing the warrant could not reasonably have believed that the warrant was valid.
 
 
 30
 Appellants also argue that they needed access to the informant's identities to show that the execution of the search warrant was a pretext to enable the officers to arrest Glenn Gorio even though they did not have evidence to support an arrest warrant. We find little merit to this argument because, again, the support this information would have provided to appellants' theory is not substantial. The officers' conduct in planning the execution of the search warrant, in particular their choice of timing, is much more probative on this point.
 
 
 31
 We thus conclude that the appellants were not denied "fair administration of justice" because the district court found the identity of the informants to be privileged.
 
 B. Limitations on questioning
 
 32
 The district court refused to allow cross examination or other rebuttal or impeachment evidence relating to the information submitted in support of the application for the search warrant. For example, while appellees' counsel elicited a deputy's statement that he had considered the factors set out in the application when planning the entry into Glenn Gorio's home, appellants' counsel was not allowed to inquire whether the officer had attempted to verify the truth of the affidavits submitted in support of the application.
 
 
 33
 Appellants contend that without testimony as to the credibility of the confidential informants, they were "powerless to refute the nefarious accusations" made against Nina Gorio. We reject this strained argument. While, as discussed below, the appellees' counsel improperly referred to the activities of the Gorio family in his opening statement, he did not cite the informant as his source. In addition, appellants had other means of rebutting any such accusations.
 
 
 34
 Appellants argue that only by showing the unreliability of the confidential informants could they show the jury that, under the "totality of the circumstances" surrounding the entry and shooting, the officers' conduct was unreasonable. Their theory is that the officers unreasonably relied on the information submitted in the application for the search warrant they were executing. However, testimony about the confidential informants was not relevant to the determination of liability or qualified immunity. Examination of the confidential informants, or cross examination as to their credibility or reputation, would have been relevant to a determination of whether probable cause existed to issue the search warrant; however, the district court had already ruled that probable cause existed. The officer who applied for the warrant was not one of the officers who executed it. The executing officers were entitled to rely on the warrant. Probable cause was no longer an issue.
 
 
 35
 Thus, because inquiry into the identity and credibility of the confidential informants would have been of doubtful relevance, and because appellants cannot show they were prejudiced by being forced to forego such inquiry, the district court did not abuse its discretion in barring cross examination, or rebuttal or impeachment evidence regarding the confidential informants.
 
 IV. Refusal to Grant a Mistrial
 
 36
 Appellants argue that the district court erred in not granting a mistrial because defendants' counsel referred to the "mafia" and the Gorio family's "long history of criminal history" in his opening statement.
 
 
 37
 The district court's decision not to grant a mistrial is reviewed for abuse of discretion. United States v. Segal, 852 F.2d 1152, 1155 (9th Cir.1988). Attorney misconduct requires reversal if the "flavor of misconduct [sufficiently permeates] an entire proceeding to provide conviction that the jury was influenced by passion and prejudiced in reaching its verdict." Kehr v. Smith Barney, Harris Upham & Co., Inc., 736 F.2d 1283, 1286 (9th Cir.1984). We have acknowledged that, in this context, "the trial court is in a far better position to gauge the prejudicial effect of improper comments than an appellate court which reviews only the cold record." Id.
 
 
 38
 We find the district court did not err in refusing to grant a mistrial. The attorney's misconduct took place at the very beginning of the trial, before the jury had become familiar with the appellants; over the course of the lengthy trial that followed, any prejudicial effect would have been substantially diluted. See United States v. Rhodes, 713 F.2d 463, 469 (9th Cir.) (no error to deny mistrial where counsel's remarks occurred at the outset of a three week trial and jury was admonished that counsel's argument was not evidence), cert. denied, 464 U.S. 1012 (1983). Moreover, this is the sole instance of misconduct appellants cite. During defendants' counsel's opening statement, the court admonished the jury that the statement was not evidence; the court also included an instruction to that effect. This court has upheld the denial of a mistrial in similar situations, where the improper remarks were made during opening or closing argument, or where the judge took curative measures. See, e.g., Cooper v. Firestone Tire and Rubber Co., 945 F.2d 1103, 1107 (9th Cir.1991) (no error to deny mistrial; alleged instances of misconduct were isolated and took place only during argument, and jury did not award excessive damages); Mateyko v. Felix, 924 F.2d 824, 827-28 (9th Cir.1990) (no error to denial mistrial where counsel made improper statements during examination and closing argument; counsel was made to apologize to opponent and court gave a curative instruction), cert. denied, 112 S.Ct. 65 (1991); Kehr, 736 F.2d at 1286 (denial of mistrial not an abuse of discretion; offending remarks occurred principally during argument and were isolated; opposing counsel did not object during closing argument; jury did not award excessive damages).
 
 
 39
 Appellants contend that this court should accord less discretion to the district court's decision not to grant a mistrial because the court was biased against them. They suggest the court believed that members of the Gorio family were engaged in criminal activity, and expressed that belief in court.
 
 
 40
 Our cases on judicial bias indicate this argument is meritless. "A trial court commits reversible error when it expresses its opinion on an ultimate issue of fact in front of the jury or it argues for one of the parties." Shad v. Dean Witter Reynolds, Inc., 799 F.2d 525, 531 (9th Cir.1986). "To demonstrate that [a] trial judge [is] biased, [appellants] must show that the judge's conduct reflected a disposition, based on extra-judicial sources, to treat [them] unfairly." Hansen v. CIR, 820 F.2d 1464, 1467 (9th Cir.1987). In this case, the judge's allegedly prejudicial comments were made while the jury was absent. In addition, appellants do not suggest any extrajudicial source for any prejudice against them. Appellants' mere allegations that the district court unfairly ruled against them are not enough to show bias.
 
 V. Qualified Immunity Instruction
 
 41
 Appellants contend that the district court's instruction on qualified immunity with regard to excessive force was flawed.
 
 
 42
 "[A] trial court has broad discretion in formulating [jury] instructions and will be reversed only upon a showing of an abuse of discretion." Benigni v. City of Hemet, 879 F.2d 473, 479 (9th Cir.1988). "[This Court] must determine whether, viewing the instructions as a whole, the court gave adequate instructions on each element of the case to ensure that the jury fully understood the issues. We must consider whether the instruction is misleading or states the law incorrectly to the prejudice of the objecting party." Kisor v. Johns-Manville Corp., 783 F.2d 1337, 1340 (9th Cir.1986) (citations omitted). Reversal is not required if "the jury's verdict [was] more probably than not untainted by the error." Haddad v. Lockheed California Corp., 720 F.2d 1454, 1459 (9th Cir.1983).
 
 
 43
 With regard to qualified immunity, "[t]he relevant inquiry is whether a reasonable government official could have believed that his conduct was lawful, in light of clearly established law and the information he possessed. This is a fact-specific, objective test." Thorsted v. Kelly, 858 F.2d 571, 573 (9th Cir.1988) (citations omitted).
 
 
 44
 The district court gave the following instruction:
 
 
 45
 In this case the defendants have asserted the defense of qualified immunity which police officers as public officials enjoy when acting on the good faith belief that their actions are in accordance with applicable law. As to this defense I remind you, the defendants have the burden of proving the defense by a preponderance of the evidence.
 
 
 46
 The defendants assert that the fatal shots were fired by Deputy Furmanski in the exercise of his lawful right of self-defense.
 
 
 47
 They also assert that Deputy Furmanski shot Mr. Gorio in furtherance of his lawful duties to protect others from unlawful attack and to overcome unlawful resistance to the performance by the SWAT team of its duties under the search warrant. Defendants further assert that the need for Deputy Furmanski to use force for these reasons interrupted the chain of proximate cause between the fatal shooting and anything which went before.
 
 
 48
 Police officers who reasonably believe that they are being knowingly resisted in the performance of their lawful duties are entitled to use such force, including deadly force, as may be reasonably necessary to overcome the resistance.
 
 
 49
 They are also entitled to use such force, including deadly force, as may be reasonable [sic] necessary to overcome unlawful attack or immediate threats to their own physical safety and well being or to that of others.
 
 
 50
 In this case the evidence is uncontroverted that before being killed that Glenn Gorio had armed himself and had fired his weapon at least once. Standing alone, however, I instruct you that these facts do not establish the defense of qualified immunity.
 
 
 51
 Under California law Mr. Gorio had the legal right to take up and to use firearms to defend his home against unwarranted intruders whom he reasonably believed to be dangerous.
 
 
 52
 His possession and use of a gun, therefore, provides a defense to the fatal shooting only if you as jurors find as facts that at the time he first shot Mr. Gorio, Deputy Furmanski was aware that Mr. Gorio was armed and reasonably believed that adequate warning had been given so that he could reasonably conclude that he was being confronted by someone who was knowingly resisting or threatening police officers rather than lawfully attempting to deal with unwarranted intruders.
 
 
 53
 Appellants argue that the instruction improperly focussed the jury's inquiry on Furmanski's subjective beliefs. However, a key component of the qualified immunity inquiry is the information available to the officer at the time. The district court's instruction directed the jury to consider what Furmanski knew at the time. The instruction correctly asked the jury to consider the reasonableness of Furmanski's belief that force was necessary and that the degree of force he employed was necessary.
 
 
 54
 Appellants argue the instruction prevented the jury from considering the "totality of the circumstances." Specifically, drawing on their arguments as to the failure to allow inquiry into the confidential information supporting the search warrant, they argue the jury was not directed to consider the reasonableness of Furmanski's belief that Glenn Gorio was a dangerous drug dealer. However, the district court had ruled that, as a matter of law, probable cause for the search warrant existed. The information supporting the warrant was furnished to Furmanski; the question of whether or not he was entitled to qualified immunity in this context did not turn on whether he should have questioned the magistrate's decision to issue the warrant--a decision the district court itself had found to be correct.
 
 
 55
 While the instruction did not explicitly direct the jury to consider the "totality of circumstances" Furmanski confronted, it adequately stated that, in deciding whether a reasonable officer would have believed the use of force was necessary, the jury was to consider all the events that took place during the execution of the warrant. The district court was understandably concerned that the jury might erroneously find Glenn Gorio's own use of a gun to be determinative; thus, it referred specifically to this issue. However, in doing so, it did not direct the jury not to consider other factors and circumstances.
 
 
 56
 Finally, the appellants suggest that the qualified immunity instruction was not supported by the evidence. There is no merit to this suggestion. There was substantial testimony that Furmanski believed warnings had been given, and that Gorio pointed a gun at Furmanski and fired. Even if there was dispute as to some of these facts, there was a basis for the jury to reach a decision in Furmanski's favor.
 
 
 57
 VI. Directed Verdict in favor of the Non-shooting Police Officers
 
 
 58
 Appellants argue that the district court erred in granting a directed verdict in favor of the deputies who participated in the effort to serve the search warrant, but who did not shoot Glenn Gorio.
 
 
 59
 In a case with similar facts, we held that "[t]he non shooting agents may be held liable only if they personally deprived Ting [the plaintiff] of a constitutional right by failing to perform an act which they were legally required to do which was the cause in fact of Ting's injuries." Ting v. United States, 927 F.2d 1504, 1511 (9th Cir.1991). In Ting, an FBI SWAT team went to Ting's residence to arrest him and search his home. Agents managed to subdue him, and were beginning to search the room he was in when he made a sudden movement. One of the agents shot Ting; the wounds rendered Ting quadriplegic. Ting filed a Bivens action against all the agents who participated in the operation. The district court entered summary judgment in favor of all defendants. While this court reversed on the issue of the shooting officer's liability, it upheld the decision in favor of the agents who were present at the shooting but did not themselves shoot. The court found that "there [was] no evidence that the four non-shooting agents knew that Burns would hurt or shoot Ting." Ting did not allege Burns had a "history of using abusive force in effecting arrests." Finally, "the agents were positioned around the room away from Burns and Ting and were thus physically incapable of preventing the incidents surrounding the shooting, all of which transpired in a matter of seconds." 927 F.2d at 1511-12. Liability for officers who did not themselves use force against the plaintiff thus rests on whether they knew the shooting officer had a tendency to use excessive force, and whether they had an opportunity to prevent the officer from shooting.
 
 
 60
 Here, appellants do not contend Furmanski had a tendency to use excessive force. Most of the deputies did not even enter the Gorio residence. Of the eight that did, only Henderson and Adams were near Furmanski. Furmanski testified that his shooting was a spontaneous action, taken in response to what he perceived was an immediate threat. The situation here was very similar to Ting; it is difficult to see how even the two officers who were at least near Furmanski could have prevented the shooting.[2]
 
 
 61
 In conclusion, the district court did not err in granting a directed verdict in favor of the non-shooting deputies on the excessive force claim. However, there was evidence that a number of the deputies, including Dickey, Pattullo, Adams, Gonzalez, Diederich and Tamayo, entered Glenn Gorio's home or otherwise participated in the execution of the search warrant. Thus, because a jury could have found they were involved in the allegedly unreasonable entry, a directed verdict in their favor on this claim was improper. However, any error in this respect was harmless. The jury found that Sergeant Henderson, who supervised the entry, enjoyed qualified immunity. It could not thus reasonably have found that those who merely followed his instructions did not have it as well.
 
 VII. Refusal to Impose Discovery Sanctions
 
 62
 The district court summarily refused to sanction either party. Appellants contend that the court abused its discretion in refusing to sanction defendants for serving 119 sets of interrogatories on plaintiffs.
 
 
 63
 The district court's decision on the imposition of sanctions is reviewed for abuse of discretion. Findings of fact related to the sanctions motion are reviewed for clear error, while the court's selection of the applicable legal standards is reviewed de novo. Fjelstad v. American Honda Motor Co., 762 F.2d 1334, 1337 (9th Cir.1985).
 
 
 64
 Appellants sued a large number of defendants, and relied on several different theories; there was a complex factual background to these claims. However, the number of interrogatories the defense served--even if it was only 115, as appellees allege--seems excessive. Nonetheless, the district court, which had a better opportunity to observe and supervise the discovery and other litigation activities of both parties, chose not to impose sanctions. We decline to find that its decision was an abuse of discretion.
 
 VIII. Attorneys' Fees
 
 65
 Appellees seek to recover attorneys' fees on appeal, either pursuant to 42 U.S.C. § 1988, under which fees may be awarded to a prevailing defendant, or to Federal Rule of Appellate Procedure 38, which provides for sanctions for a frivolous appeal.
 
 
 66
 The two statutes require a similar analysis. Under 42 U.S.C. § 1988, the court may award attorneys' fees to the prevailing party in a section 1983 suit. However, while a prevailing plaintiff "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust," Hensley v. Eckerhart, 461 U.S. 424, 429 (1983), "[a] prevailing defendant may recover an attorney's fee only where the suit was vexatious, frivolous, or brought to harass or embarrass the defendant." Id. at 429 n. 2. We have held that sanctions for a frivolous appeal are appropriate when "the result is obvious or the arguments of error are wholly without merit." In re Becraft, 885 F.2d 547, 548 (9th Cir.1989).
 
 
 67
 We conclude that this appeal was not frivolous. The lower court expressly invited the appellants to appeal its decision to bar discovery of the information provided by the confidential informant. The district court made several other decisions the appellants could reasonably seek to test. The issues in this case involved a complex area of law, where cases are often fact specific. Thus, neither sanctions nor fees to the prevailing defendant would be appropriate in this case.
 
 
 68
 AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Appellants rely principally on Larez v. City of Los Angeles, 946 F.2d 630 (9th Cir.1991). In that case, we upheld a finding of individual liability of Los Angeles police chief Gates for a brutal and destructive search police officers had conducted. The Larez plaintiffs alleged that because Gates maintained a defective citizen complaint procedure, he condoned and ratified the officers' actions. At trial, a recognized expert on police procedure testified that the police department's and Gates' procedure for resolving citizen complaints was flawed, and was biased in such a way that citizen complaints would almost never be sustained. However, in this case, there was no evidence, of the kind presented in Larez, to support a finding that Block's actions (or failure to act) with respect to the Gorio incident constituted such ratification
 
 
 [2]
 Appellants propound an amorphous "group liability" theory. However, the cases on which they rely are inapposite. In Rutherford v. City of Berkeley, 780 F.2d 1444 (9th Cir.1986), the plaintiff could not say which of the officers present while he was being beaten actually inflicted the blows. We reversed directed verdicts in favor of the officers he could not identify with certainty as aggressors, because the jury could have found that these "bystander" officers were not in fact bystanders. In Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553 (1st Cir.1989), four officers illegally fired on the plaintiff. Although only one officer's bullet hit the plaintiff, all four participated in the deprivation of rights. Finally, James v. Sadler, 909 F.2d 834 (5th Cir.1990) involved an unreasonable search and detention. Since even the officers who only secured the premises participated in the detention, a jury could have found them liable. In contrast Ting indicates that in cases involving a single act of allegedly excessive force, liability is not so extensive